## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

**LESLIE YOFFIE,**

           **Plaintiff,**

**v.**

**BAYER HEALTHCARE, LLC,**

Serve: CSC Lawyers Incorporating Service
Company
221 Bolivar Street
Jefferson City, MO 65101
(800) 927-9800

          **Defendant**.

Case No.: 12SL-CC04019

Division:



RECEIVED & FILED
CIRCUIT COURT OF
ST. LOUIS COUNTY
2012 OCT 22 PM 1:40
JOAN M. GILMER
CIRCUIT CLERK

## PLAINTIFF'S CLASS ACTION PETITION

Plaintiff Leslie Yoffie, on behalf of herself and all others similarly situated, brings this action against Defendant Bayer HealthCare, LLC ("Bayer" or "Defendant") and for her Petition, based upon personal knowledge as to her own acts and upon information and belief (based on the investigation of counsel) as to all other matters, alleges as follows:

## INTRODUCTION

1.     With this lawsuit, Plaintiff challenges Defendant's unconscionable, unfair, deceptive, unethical and illegal practice of misleading consumers into throwing away their Bayer Aspirin as soon as its so-called "expiration date" has passed, even though Defendant knows, or should know, that if stored properly these medications can and do remain chemically stable, safe and effective long after those dates.

2.     On behalf of herself and similarly situated Missouri consumers, Plaintiff seeks damages and equitable relief, including an order compelling Defendant to provide consumers with accurate information regarding the meaning of the so-called "expiration dates" printed on



EXHIBIT
1

the packages of Bayer Aspirin; to provide accurate information as to when Bayer Aspirin is no longer safe and effective; and to tell consumers how to store their medications to extend the medications' useful lives.

3.      Bayer Aspirin is an Over-the-Counter" ("OTC") medication, available without a physician's prescription for minor, temporary conditions like headaches, menstrual pain, minor pain of arthritis, muscle pain, pain and fever of colds, and toothache. As required by regulations promulgated by the United States Food & Drug Administration ("FDA"), every container of Bayer Aspirin displays a date, called an "expiration date." That date does not mean that the medication is unsafe or ineffective once the date has passed.

4.      FDA requires a manufacturer like Bayer to conduct testing to assure the stability of its OTC drug products only up until a date of the manufacturer's own choosing, but not thereafter. That date becomes the so-called "expiration date."

5.      Nevertheless, Defendant has admitted that its tests have found that Bayer Aspirin remains safe and effective for as long as two years past that date. On information and belief, however, Defendant has not tested Bayer Aspirin's stability to the point at which it loses its effectiveness.

6.      Established medical authorities, including Harvard Medical School and Johns Hopkins University School of Medicine, have likewise concluded that medications such as Bayer Aspirin remain safe and effective long after their so-called "expiration dates." Their conclusion was based in part on testing by the federal government.

7.      On its web sites and elsewhere, Defendant nevertheless illegally deceives consumers into throwing away Bayer Aspirin as soon as the "expiration date" has passed by misrepresenting those supposedly "expired" medications as unsafe and ineffective.

2

8.      The purpose behind this scheme is to increase Defendant's sales and profits because consumers have to purchase replacement medications for those they have thrown out.

9.      Defendant carries out this illegal scheme in a number of ways, both individually and collectively with other members of its industry.  For example, Defendant not only makes affirmative misrepresentations about the need to get rid of supposedly "expired" medications, but it fails to provide to consumers information that it knows, or should know, to be true and that would make the so-called "expiration dates" not misleading, including that it chooses the "expiration date" based on its own marketing considerations, not scientific reasons, and that the "expiration date" does not indicate how long the product is actually "good" or safe to use.  Nor, among other omissions, does Defendant state that consumers may continue to take the product as long as it works as expected and should discard it only if it loses effectiveness.

10.     Defendant conspires with other manufacturers of OTC medications to carry out this scheme by promoting disposal of supposedly expired medications through their industry associations, the Pharmaceutical Research and Manufacturers of America ("PhRMA") and the Consumer Healthcare Products Association ("CHPA").  These associations engage in supposed public service campaigns to mislead consumers into believing that it is socially responsible to throw away medications that have passed their so-called "expiration dates."

11.     By its actions in deceiving consumers into getting rid of medications that are still "good," Defendant has violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* ("MMPA"), and engaged in an illegal civil conspiracy, causing injury to Plaintiff and the other members of the class.

3

## VENUE AND JURISDICTION

12.     The Circuit Court of St. Louis County has subject matter jurisdiction over this action because the actions complained of regarding Plaintiff took place in St. Louis County. V.A.M.S. 407.025.1.

13.     This court has personal jurisdiction over Defendant because it regularly conducts business in St. Louis County.

14.     Venue is proper in the Circuit Court of St. Louis County because the cause of action arose in St. Louis County.  V.A.M.S. 407.025.1.

## PARTIES

15.     Plaintiff Leslie Yoffie is, at all times relevant hereto, a Missouri citizen residing in St. Louis County who purchased, for personal, family or household purposes, Bayer Aspirin and discarded it after the expiration date even though there was medication remaining.

16.     Defendant Bayer HealthCare, LLC ("Bayer") is a Delaware corporation with a principal place of business in Tarrytown, New York.  It claims to be "one of the world's leading, innovative companies in the healthcare and medical products industry" and to have an "ongoing commitment to transparency."[1]  Bayer does substantial business within the State of Missouri through its sale of Bayer Aspirin within the State.

---

[1] (http://pharma.bayer.com/scripts/pages/en/news_room/news_room/news_room92.php (accessed October 11, 2012) and http://www.bayerhealthcare.com/scripts/pages/en/commitment/public_policy/index.php (accessed October 11, 2012).

## FACTUAL BACKGROUND

**A.    The so-called "expiration date" mandated by government regulations does not indicate how long the product remains stable, safe and effective**

17.    FDA regulations require that manufacturers of OTC medications include a date, called an "expiration date," on the immediate container as well as the outer package of the product. 21 C.F.R. §§ 211.137(b), 201.17.

18.    Manufacturers of OTC medications are required to have a written testing program designed to assess the stability characteristics of their drug product in its original packaging and to use the results of such testing in determining the so-called "expiration date" of the product. 21 C.F.R. § 211.166. But nothing in the regulations determines the precise shelf life that the manufacturers must test; the "expiration date" is therefore subject to the manufacturer's unilateral decision.

19.    Nor do the regulations prevent manufacturers from conducting tests to determine how long the products remain stable. However, on information and belief, Defendant regularly tests Bayer Aspirin only up to the "expiration date" it chooses, but not beyond it.

20.    Moreover, on information and belief, Defendant tests Bayer Aspirin only in its sealed, original packaging under conditions likely to be encountered during shipping and storage at retail. It does not test Bayer Aspirin under conditions of storage in a typical consumer's home, such as in an intermittently hot and humid bathroom after the bottle's seal has been broken and the bottle has been opened. The regulations do not prohibit such testing.

21.    Nor does federal law govern when it is permissible for a consumer to take an OTC medication. The regulations control only the period when it can be sold.

5

22.    Thus, an "expiration date" is simply the manufacturer's representation that the medication will remain stable in the original sealed packaging until that date, but it says nothing about whether the medication will or will not remain stable beyond that date.

**B.    As Defendant knows or should know, Bayer Aspirin remains stable, safe and effective long after the "expiration date" on its labels**

23.    Defendant knows, or should know, that OTC medications like Bayer Aspirin remain stable and are safe and effective for consumers to use years after their "expiration dates."

24.    Beginning in the 1980s, the FDA conducted a program at the request of the United States military, called the "Shelf Life Extension Program" or "SLEP." The program was designed to keep the military from having to discard hundreds of millions of dollars' worth of supposedly expired stockpiled medicines. Under it, the FDA tested the stability of more than 100 prescription and OTC drugs.

25.    According to findings that, as described below, were later relied upon by physicians and scientists, 90% of the medications tested "were safe and effective far past their original expiration date, at least one for 15 years past it." Laurie Cohen, *Many Medicines Are Potent Years Past Their Expiration Dates*, Wall Street Journal at A-1 (March 29, 2000).

26.    As a result of this program, the military stopped discarding supposedly "expired" medication and, its savings were huge. During just five years in the 1990s, the program resulted in net savings of approximately $260 million from drugs that did not need to be destroyed and replaced. *Id.*

27.    The study found "that expiration dates put on by manufacturers typically have no bearing on whether a drug is usable for longer.... '[M]anufacturers put expiration dates on for marketing, rather than scientific reasons'.... 'It's not profitable for them to have products on a

shelf for 10 years. They want turnover.'" *Id.* (quoting Francis Flaherty, former director of the SLEP testing program).

28.   The study also found that, but for exceptions like nitroglycerin, insulin and some liquid antibiotics – none of them subject to Plaintiff's claims herein – "[m]ost drugs degrade very slowly…. In all likelihood, a product at home can be kept for many years, especially if it's in the refrigerator." *Id.* (quoting Joel Davis, former FDA expiration-date compliance chief).

29.   The findings came as a revelation to Army Col. George Crawford, a pharmacist, who took over the program in 1997. According to him, "nobody tells you in pharmacy school that shelf life is about marketing, turnover and profits." *Id.*

30.   Moreover, a vice president at Defendant's parent corporation, Bayer AG, was quoted as saying that the company had data showing that Bayer Aspirin remained effective long after its expiration dates. The article stated:

> Consider aspirin. Bayer AG puts two-year or three-year dates on aspirin and says that it should be discarded after that. Chris Allen, a vice president at the Bayer unit that makes aspirin, says the dating is "pretty conservative"; when Bayer has tested four-year-old aspirin, it remained 100% effective, he says.

*Id.*

31.   According to the article, Defendant's executive acknowledged that it had never tested Bayer Aspirin beyond that point, but an independent scientist had:

> Bayer has never tested aspirin beyond four years, Mr. Allen says. But Jens Carstensen has. Dr. Carstensen, professor emeritus at the University of Wisconsin's pharmacy school, who wrote what is considered the main text on drug stability, says, "I did a study of different aspirins, and after five years, Bayer was still excellent. Aspirin, if made correctly, is very stable."

*Id.*

32.   FDA found that most drugs have a 36-month "expiration date" from the date of manufacturing, a period that is based on the companies' commercial distribution practices and

7

marketing strategies because they make money by turning over their product. *History of the U.S. Food and Drug Administration*, Interviewee: Francis J. Flaherty, June 14, 2000, at 30. Manufacturers would use a shorter date if they could "get away with it." *Id.*

33.    FDA also found that drugs degrade only very slowly. They do so "on a curve; in most cases a long, slow curve." *Id.* at 31.

34.    The drug companies were well-aware of the SLEP program and never challenged the findings despite losing millions of dollars in sales as a result of it. *Id.* at 36. The SLEP program prevented the drug companies from "ripping off" the government by selling products with unrealistically short expiration dates. *Id.* at 36.

35.    Since the SLEP program came to light, many medical authorities have relied on it and other data to come to the conclusion that supposedly "expired" drugs, especially OTC medications taken for minor, non-life-threatening conditions, need not be discarded.

36.    On August 21, 2003, the Medscape website published an article titled, "Do Medications Really Expire?"[2]  Medscape is a website that "offers specialists, primary physicians, and other health professionals the Web's most robust and integrated medical information and educational tools." Its mission is "[t]o provide clinicians and other healthcare professionals with the most timely comprehensive and relevant clinical information to improve patient care."[3]

37.    Relying in part on the FDA's SLEP study, the Medscape article reported that the "expiration date" on a drug label "does not mean how long the drug is actually 'good' or safe

---

[2] Richard Altschuler, *Do Medications Really Expire?*, http://www.medscape.com/viewarticle/460159 (accessed October 11, 2012; registration required).

[3] http://www.medscape.com/public/about (accessed October 11, 2012).

to use."[4] According to the article drugs past their "expiration date" are not unsafe: "[M]edical authorities uniformly say it is safe to take drugs past their expiration date -- no matter how 'expired' the drugs purportedly are."

38.    The author of the Medscape article advised:

> Even 10 years after the "expiration date," most drugs have a good deal of their original potency. So wisdom dictates that if your life does depend on an expired drug, and you must have 100% or so of its original strength, you should probably toss it and get a refill, in accordance with the cliché, "better safe than sorry." If your life does not depend on an expired drug – such as that for headache, hay fever, or menstrual cramps – take it and see what happens.

*Id.* Bayer Aspirin is taken for the non-life threatening condition of headache that the author listed.

39.    The author concluded by referring to the "many billions of dollars the pharmaceutical industry bilks out of unknowing consumers every year who discard perfectly good drugs and buy new ones because they trust the industry's 'expiration date labeling.'" *Id.*

40.    Harvard Medical School has also come to the conclusion that drugs are not ineffective simply because the "expiration date" has passed. The *Harvard Health Letter* has stated that expiration dates "serve more to protect the pharmacies and manufacturers than to tell you when your pills are no good." Thomas H. Lee, *By the Way, Doctor – Are expired medications dangerous*, Harvard Health Letter (July 2003). That article stated that drugs that are past the "expiration date" are neither harmful nor ineffective:

> There are two ways in which pills might "go bad." Theoretically, the chemicals in a medication could break down into something that's harmful. But cases of that actually happening are virtually unknown. There was one report of an antibiotic that had degraded into a form that was harmful to the kidneys, but that antibiotic has been changed so this danger is practically nonexistent.

---

[4] http://www.medscape.com/viewarticle/460159  (accessed October 11, 2012)

> The more important issue is whether pills lose their potency because they have been exposed to air, light, and moisture. Sitting in their vials in a dry, dark place like a medicine cabinet, most pills will stay effective for at least five years. Some medications have been shown to be stable as many as 30 years after they were made.

*Id.*

41.    Similarly, the *Harvard Medical School Family Health Guide*, relying on the Medscape article discussed above and the work that the FDA did for the military, came to this conclusion: "So the "expiration date" doesn't really indicate a point at which the medication is no longer effective or has become unsafe to use. Medical authorities state expired drugs are safe to take, even those that expired years ago…. Excluding nitroglycerin, insulin, and liquid antibiotics, most medications are as long-lasting as the ones tested by the military. Placing a medication in a cool place, such as a refrigerator, will help a drug remain potent for many years." *Drug Expiration Dates – Do They Mean Anything?*, The Harvard Medical School Family Health Guide (November 2003 Update).

42.    Johns Hopkins University School of Medicine has come to the same conclusion. Its web site, "Johns Hopkins Medicine Health Alerts," has reported that "expiration dates" are set very conservatively and are not the last date when drugs are effective:

> Think of expiration dates – which the U.S. Food and Drug Administration (FDA) requires be placed on most prescription and OTC medications – as a very conservative guide to longevity. … Most medications, though, retain their potency well beyond the expiration date, and outdated medications, whether prescription or OTC, are not usually harmful.

Johns Hopkins Health Alert, *How Long Do Medications Last?*, April 21, 2009.

43.    Johns Hopkins also distinguished between drugs taken for serious diseases and OTC medications, like the ones at issue in this litigation, taken for a headache. The article advised that patients should consider replacing the former but not OTC drugs: "Also, consider replacing any outdated medications that you're taking for a serious health problem, since its

potency is more critical than that of an OTC drug you take for a headache or hay fever." *Id.* Contrary to that advice, Defendant tells consumers to throw away even OTC drugs.

44.    In addition, the nursing profession is also aware that medications need not be discarded after the "expiration date" has passed. In 2008, Amy M. Karsh, associate professor of clinical nursing at the University of Rochester, stated in the American Journal of Nursing:

> It seems reasonable to continue to use drugs past the stamped expiration date as long as caution is used with drugs that have a narrow therapeutic range, drugs in solution or suspension, nitroglycerin, tetracycline (Sumycin), and any drug that looks odd or develops a peculiar smell. (Aspirin, which is often stable for years after its expiration date, will start to smell like vinegar when it becomes unstable. It isn't toxic, but it will lack potency and should be discarded.)

Amy Karsh, *Waste Not?*, 108 Am. J. Nursing 86, 87 (2008). None of the types of drugs as to which she recommended using caution include Bayer Aspirin. *Id.*

45.    Defendant's industry associations also acknowledge that OTC medications such as Bayer Aspirin remain effective long after their "expiration dates." PhRMA participates in, and CHPA is a supporter of, a campaign called "**SMAR₁T DISPOSAL.**" The web site of this campaign states that "if stored properly, medications can remain effective (biologically active) for months or even years after the expiration date."[5]

**C.    Defendant deceptively tells consumers to throw away Bayer Aspirin after its so-called "expiration date"**

46.    Despite claiming to have an "ongoing commitment to transparency," Defendant misleads and deceives consumers into believing that supposedly expired Bayer Aspirin should be thrown away and that if it is not, it will be unsafe and ineffective.

---

[5] http://www.smarxtdisposal.net/questions.html (accessed October 11, 2012).

47.     Defendant maintains a web site called "Bayer Aspirin, Expect Wonders" with a page entitled "FAQs" or Frequently Asked Questions.[6] The very first question on the page – even before questions about whether aspirin is safe or should be taken with food – asks whether Bayer Aspirin can be used beyond the expiration date.  Defendant answers no.  That web page contains the following "frequently asked question" and answer:

> **Can I use Bayer Aspirin beyond the labeled expiration date?**
>
> It is not recommended to use any OTC product beyond the labeled expiration date. Like all drugs, aspirin can deteriorate over time and not be as effective once it is past expiration.

48.     This misrepresentation is directly contrary to what Chris Allen, the Bayer vice president quoted above, said to the *Wall Street Journal* in admitting that Bayer's expiration dating is "pretty conservative" and that when Defendant has tested supposedly expired Bayer Aspirin, it remained 100% effective for at least two years beyond its two-year expiration date. Cohen, *supra.*

49.     Also contrary to Defendant's claim to have an "ongoing commitment to transparency," Defendant's web site described above omits the following material facts:

- Defendant chooses the "expiration date" itself and chooses a date based on its own marketing considerations, not scientific reasons.

- The product will remain safe after the "expiration date."

- The "expiration date" does not indicate how long the product is actually "good" or safe to use.

- The product will remain effective for long periods after the "expiration date" if stored properly.

---

[6] www.wonderdrug.com/faq.htm#q1 (accessed October 11, 2012).

- Consumers may continue to take the product as long as it works as expected to relieve the consumers' symptoms and should discard it if it loses effectiveness.

- To increase the life of the product, consumers should store it in a cool, dry place and not keep it in a hot and humid bathroom.

50.     In addition, every package of Bayer Aspirin sold in Missouri contains an "expiration date" but omits the information listed in the preceding paragraph, which is necessary to make that date not misleading.

51.     Another way that Defendant carries out this scheme is through its industry associations, PhRMA and CHPA.

52.     In the guise of protecting the environment, PhRMA's and CHPA's "**SMARₓT DISPOSAL**" campaign encourages consumers to dispose of supposedly expired OTC medication. **SMARₓT DISPOSAL** purports to provide consumers with "guidance on proper disposal of unused and *or expired* prescription and *OTC medications.*"[7] This web site preys upon consumers' desire to be good environmental stewards to encourage them to get rid of, not just unneeded medications, but supposedly expired medications that are still safe and effective.

53.     As noted above, the **SMARₓT DISPOSAL** campaign (and Defendant through its participation in it) admits that medications remain effective long after their "expiration dates." Yet, inexplicably the web site states that this is a reason to throw away these effective medicines rather than continuing to use them. Here is the complete question and answer containing this deceptive statement:

I have medicines in my cabinet that expired months, or even years, ago. Can I just dump those down the toilet?

---

[7] http://www.smarxtdisposal.net/questions.html (accessed October 11, 2012) (emphasis added).

The expiration date on medications is the date at which the manufacturer can still guarantee the safety and full potency of the medication. However, if stored properly, *medications can remain effective (biologically active) for months or even years after the expiration date. Therefore, we also recommend you follow our SMAR$_x$T DISPOSAL guidelines for disposing of expired medicines.* Important note: Never take an expired medication without checking with your pharmacist first.[8]

54.    This statement is clearly designed to deceive consumers into discarding perfectly safe and effective OTC medications. If they were simply concerned about protecting the environment rather than increasing pharmaceutical sales, PhRMA, the CHPA, SMAR$_x$T DISPOSAL and Defendant would state on this web site and elsewhere that consumers could safely continue to take their supposedly expired OTC medications and not throw them away until they are no longer needed or effective.

55.    PhRMA and CHPA also sponsor a campaign that purports to be designed to curb drug abuse, called "The American Medicine Chest Challenge." This program preys on consumers' desire to prevent drug abuse in order to persuade them to dispose of, not merely unneeded medications or drugs of abuse, but supposedly expired OTC medications.

56.    On its web site, The American Medicine Chest Challenge invites consumers to "Take the American Medicine Chest Challenge … in 5 Simple Steps." Two of those steps tell consumers that they should take an inventory of their OTC medicines and discard the ones that have supposedly "expired." Those two steps are:

Take inventory of your prescription and *OTC* medicine.

\*    \*    \*

Dispose of your unused, unwanted, and *expired* medicine in your <u>home</u> or at an American Medicine Chest Challenge Disposal site.[9]

---

[8] http://www.smarxtdisposal.net/questions.html (accessed October 11, 2012) (emphasis added).

[9] http://www.americanmedicinechest.com/ (accessed October 11, 2012) (italic emphasis added).

14

57.    Moreover, CHPA maintains and makes publicly available on the internet a conduct code, called "Expiry Dating Code for OTC Drug Products," which states that the expiration date is "the date beyond which the drug product should not be used." In addition, the Code states "that consumers should, from time to time, review the contents of their OTC medicines [*sic*] inventory and discard products whose dates are past the expiration date fixed on the package."[10]

58.    These various industry web sites omit the following material facts:

- The manufacturer chooses the "expiration date" itself and chooses a date based on its own marketing considerations, not scientific reasons.

- The product will remain safe after the "expiration date."

- The "expiration date" does not indicate how long the product is actually "good" or safe to use.

- The product will remain effective for long periods after the "expiration date" if stored properly.

- Consumers may continue to take the product as long as it works as expected to relieve the consumers' symptoms and should discard it if it loses effectiveness.

- To increase the life of the product, consumers should store it in a cool, dry place and not keep it in a hot and humid bathroom.

59.    Defendant has no legitimate reason for misleading consumers about expiration dates. Indeed, the reasons offered by the industry for not telling consumers that drugs remain safe and effective after they have supposedly expired or for failing to test them for longer periods do not hold up to analysis.

60.    In an article published on December 18, 2006, on the website redorbit.com, Alan Goldhammer, vice-president of PhRMA, offered, as the only reason why drugs may not be

---

[10] Expiry Dating Code for OTC Drug Products, found at http://www.chpa-info.org/scienceregulatory/Voluntary_Codes.aspx#expiry (accessed October 11, 2012).

effective after the "expiration date," that "[m]any consumers keep their drugs in the bathroom, exposed to heat and humidity that degrade drugs."[11]

61.     This explanation was a sham as applied to Bayer Aspirin. On information and belief Defendant does not test its Bayer Aspirin products under high heat or humidity, and it does not advise consumers not to keep their medications in the bathroom.

62.     Moreover, to the extent, if any, that it significantly degrades an OTC drug if it is kept in a hot and humid bathroom, such conditions occur before as well as after the "expiration date" and render the "expiration date" on the package inapplicable to a consumer's use of the product. This only adds to the reasons why Defendant's misrepresentations regarding its "expiration dates" are false and misleading.

63.     Goldhammer also offered reasons why manufacturers do not test drugs for longer periods. Again his explanation was a sham. The article stated: "The industry calls the idea [of testing drugs for longer periods] a non-starter. Why would a company spend time and money testing a drug's shelf life when its patent expires after a number of years, Goldhammer said. Most medicines, he added, are given in quantities that should be taken fully to treat the illness, with no leftovers."

64.     Neither reason has any validity as applied to Bayer Aspirin.

- Whatever the relevance of a product's patent protection is to a company's decision about shelf life, the issue does not apply to the drugs at issue here, which are not patented and which have generic equivalents on the market in the United States. Thus, there is no reason not to test the drugs for longer periods simply because they might come off patent.

- The drugs at issue here are not sold in quantities limited to treat a single illness with no "leftovers." They are for recurring headaches, menstrual

---

[11] *Study Highlights Debate Over Drug Expiration Dates*, http://www.redorbit.com/news/health/771253/study_highlights_debate_over_drug_expiration_dates/ (accessed October 11, 2012).

cramps, minor arthritis pains and the like. Defendant knows that. Otherwise there would be no reason to tell consumers to discard the drugs when they pass their "expiration dates."

65.    Because of Defendant's actions, consumers do not know precisely, or even generally, how long Bayer Aspirin remains safe and effective. Thus, many consumers get rid of their Bayer Aspirin simply out of ignorance.

## CLASS ACTION ALLEGATIONS

66.    Pursuant to Mo. Rev. Stat. § 407.025.3(6) and Missouri Rule of Civil Procedure 52.08(b)(2) with respect to the claim for injunctive and declaratory relief, and pursuant to Mo. Rev. Stat. § 407.025(7) and Missouri Rule of Civil Procedure 52.08(b)(3) with respect to the claim for actual damages, Plaintiff seeks to represent the following Class

> All Missouri citizens who purchased Bayer Aspirin for personal, family, or household purposes and later discarded and replaced it.

> Excluded from the proposed Class are Defendant, their Officers, Directors, and employees, as well as employees of any subsidiary, affiliate, successors, or assignees of Defendant. Also excluded is any trial judge who may preside over this case.

67.    The Class is believed to comprise numerous consumers, the joinder of whom is impracticable, both because they are geographically dispersed across the state and because of their number.

68.    Class treatment will provide substantial benefits to the parties and the Court. A well-defined commonality of interest in the questions of law and fact involved affect Plaintiff and the putative Class Members. Common questions of law and fact include:

> A.    What is the basis for the "expiration date" of Bayer Aspirin?

> B.    Is the "expiration date" of Bayer Aspirin the last date on which the medication is stable, safe and effective?

> C.    Is Bayer Aspirin safe after its "expiration dates?"

17

D.   Is Bayer Aspirin effective after its "expiration dates?"

E.   Does Defendant choose the "expiration dates" of Bayer Aspirin and does it choose dates based on marketing considerations, rather than scientific reasons?

F.   Does Defendant advise consumers to discard their Bayer Aspirin after their "expiration dates?"

G.   Does Defendant advise consumers that it is unsafe not to discard Bayer Aspirin after its "expiration date?"

H.   Is it deceptive for Defendant to advise consumers to discard their Bayer Aspirin after its "expiration date?"

I.   Is it deceptive for Defendant not to advise consumers that it chooses the "expiration dates" of its Bayer Aspirin and chooses dates based on its own marketing considerations, not scientific reasons?

J.   Is it deceptive for Defendant not to advise consumers that their Bayer Aspirin will remain safe after the "expiration date?"

K.   Is it deceptive for Defendant not to advise consumers that their Bayer Aspirin will remain effective for long periods after the "expiration date?"

L.   Is it deceptive for Defendant not to advise consumers that consumers may continue to take Bayer Aspirin as long as it remains effective and should discard it if it loses effectiveness?

M.   Is it deceptive for Defendant not to advise consumers that to increase the life of their Bayer Aspirin, they should store it in a cool, dry place and not keep it in a hot and humid bathroom?

N.   Is it an unfair practice under the MMPA for Defendant not to inform consumers how long Bayer Aspirin can be expected to remain safe and effective in the consumer's home?

O.   What relief is appropriate to remedy Defendant's illegal conduct described herein?

69.   Questions of law and fact common to members of the Class, some of which are set forth above, predominate over any questions affecting only individual members of the Class. The resolution of common questions in this case will resolve the claims of both Plaintiff and the Class.

70.     Plaintiff's claims are typical of the claims of the proposed Class in that Plaintiff and the members of the class purchased Bayer Aspirin for personal or household use and later discarded it after the "expiration date" and replaced the medication.

71.     Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained competent and experienced counsel in the prosecution of this type of litigation.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class are numerous and individual joinder is impracticable. The expenses and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiff's claims is manageable.

73.     Unless a class is certified, Defendant will continue to engage in unfair and deceptive practices and continue to commit violations of Missouri law, to the detriment of Plaintiff and proposed Class Members.

74.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

75.     Plaintiff's claim for injunctive and declaratory relief on behalf of the Class is maintainable as a class action pursuant to Mo. Rev. Stat. § 407.025.3(6) and Missouri Rule of Civil Procedure 52.08(b)(2).

76.     Plaintiff's claim for actual damages on behalf of the Class is maintainable as a class action pursuant to Mo. Rev. Stat. § 407.025(7) and Missouri Rule of Civil Procedure 52.08(b)(3).

## JURY DEMAND

77.    Plaintiff demands a trial by jury on all issues so triable.

## COUNT I

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT

78.    Plaintiff incorporates by reference and re-alleges all preceding paragraphs of the Petition as though fully set forth herein.

79.    Defendant's web sites described herein, as well as the web sites maintained by its industry associations, as described herein, are advertisements as defined in the MMPA, Mo. Rev. Stat. § 407.010(1), because they are attempts by publication, dissemination, solicitation, circulation, or any other means to induce, directly or indirectly, consumers to enter or acquire any title or interest in any merchandise, specifically Bayer Aspirin.

80.    Bayer Aspirin is merchandise as defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because it is objects, wares or commodities.

81.    Defendant is a person as that term is defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because it is a for-profit corporation.

82.    The sales by Defendant and the purchases by Plaintiff and the class members of Bayer Aspirin are sales as that term is defined in the MMPA, Mo. Rev. Stat. § 407.010(6), because they are sales of merchandise for cash or for credit.

83.    The advertising, offering for sale and sale of OTC medications by Defendant, as described herein, constitute trade or commerce as defined in the MMPA, Mo. Rev. Stat. § 407.010(4), because they directly or indirectly affect the people of this state.

84.    Defendant's actions described herein violate the MMPA in that they constitute deception, fraud, false pretense, false promise, misrepresentation, unfair practice and/or the

20

concealment, suppression, or omission of material fact in connection with the sale of merchandise in trade or commerce, within the meaning of the MMPA.

85.    Defendant's actions described herein violate the MMPA because they constitute unfair practices as that term is defined in Mo. Code Regs. tit. 15, § 60-8.020. Specifically, they (a) offend the public policy as it has been established by the Constitution, statutes or common law of this state, and/or by the Federal Trade Commission, and/or its interpretive decisions and/or (b) are unethical, oppressive and/or unscrupulous. In addition, those actions present a risk of substantial injury to Plaintiff and the class, whose members are at risk of discarding safe and effective medication because of Defendant's actions as alleged herein.

86.    Plaintiff purchased Bayer Aspirin manufactured by Defendant and thereby suffered an ascertainable loss of money or property as a result of the use or employment by Defendant of the actions described herein by virtue of having discarded that medication after its "expiration date" and spending money to replace it.

87.    The unlawful actions of Defendant alleged herein caused similar injury to the other members of the Class.

88.    Injunctive relief is necessary to protect Plaintiff and the members of the Class from Defendant's unlawful acts.

## COUNT II – CIVIL CONSPIRACY

89.    Plaintiff incorporates by reference and re-alleges all preceding paragraphs of the Petition as though fully set forth herein.

90.    Defendant engages in a civil conspiracy to deceive consumers into discarding and replacing safe and effective medications that have passed its "expiration date" and to engage in the unfair practices described herein.

21

91.    Defendant and the other members of PhRMA and CHPA are members of the conspiracy.

92.    The conspiracy has the unlawful objective of deceiving consumers into believing that their supposedly expired OTC medications, including Bayer Aspirin, are neither safe nor effective, thereby inducing them to discard or stop using and replace them.

93.    Defendant and the other members of PhRMA and CHPA had a meeting of the minds on the object or course of the conspiracy.   This meeting of the minds was and is manifested by the actions of those associations, as alleged herein.

94.    In furtherance of this conspiracy, Defendant committed the acts alleged herein.

95.    The following actions of Defendant, among others, are unlawful overt acts in furtherance of the conspiracy.

- The deceptive and unfair actions of Defendant, through PhRMA and CHPA, to mislead consumers into disposing of medications that had passed their "expiration dates," such as the "SMART DISPOSAL" and American Medicine Chest Challenge campaigns.

- The deceptive and unfair statements and omissions of material facts on Defendant's web sites, as alleged herein.

- The omission of material facts on the packaging of Defendant's OTC medications, as alleged herein.

96.    Appropriate injunctive relief is necessary to undo the effects on Plaintiff and the Class of this civil conspiracy.  If the civil conspiracy is not stopped by such injunctive relief, Plaintiff and the members of the class will continue to suffer injury by being induced to discard safe and effective OTC medications and spending money for replacement medication.

## **PRAYER FOR RELIEF – ALL COUNTS**

Plaintiff and Class request the Court enter judgment in their favor and against Defendant as follows:

22

(A)    Ordering that this action be maintained as a class action on behalf of the following

Class:

> **All Missouri citizens who purchased Bayer Aspirin for personal, family, or household purposes and who later discarded and replaced it.**
>
> Excluded from the class and subclasses are officers, directors and employees of Defendant and any entity affiliated with or controlled by Defendant, counsel and members of the immediate families of counsel for Plaintiff herein, and the judge presiding over this action and any member of the judge's immediate family.  Certifying Plaintiff as Class Representative and appointing Plaintiff's counsel as counsel for the Class;

(B)    Certifying Plaintiff as Class Representative and appointing Plaintiff's counsel as

counsel for the Class;

(C)    Awarding appropriate equitable relief, as determined by the Court, including an

order requiring Defendant to take all steps necessary to accurately disclose the

meaning of the "expiration dates" printed on the packages of its Bayer Aspirin; to

provide accurate information as to when its Bayer Aspirin products are no longer

stable, safe, and effective;  to tell consumers how to store their medications to

extend the medications' useful lives; and to provide all applicable financial relief

naturally flowing from Defendants' obligations under the injunction;

(D)    Awarding Plaintiff and the Class damages as provided by law;

(E)    Awarding Plaintiff and the Class punitive damages as provided by law;

(F)    Awarding Plaintiff and the Class costs and reasonable attorneys' fees herein;

(G)    Awarding such other and further relief as the court deems fit and proper.


Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD**

23

By: _____
Richard S. Cornfeld, #31046
1010 Market Street, Suite 1605
St. Louis, MO 63101
P. 314-241-5799
F. 314-241-5788 (fax)
rcornfeld@cornfeldlegal.com

*Attorney for Plaintiff*

24



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>COLLEEN DOLAN | Case Number: 12SL-CC04019 |
|---|---|
| Plaintiff/Petitioner:<br>LESLIE YOFFIE<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>RICHARD S CORNFELD<br>1010 MARKET STREET<br>STE 1605<br>ST LOUIS, MO 63101 |
| Defendant/Respondent:<br>BAYER HEALTHCARE LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>7900 CARONDELET AVE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| The State of Missouri to:  BAYER HEALTHCARE LLC<br>                                       Alias:<br>**CSC LAWYERSS INCORPORATING**<br>**SERVICE COMPANY**<br>**221 BOLIVAR STREET**<br>**JEFFERSON CITY, MO 65101** | |
| ***COURT SEAL OF***<br><br>***ST. LOUIS COUNTY*** | You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.<br><br>29-OCT-2012                                                       _____<br>Date                                                                            Clerk<br><br>Further Information:<br>JMC |

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                                     _____
Printed Name of Sheriff or Server                              Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____                     _____
                                          Date                                          Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $   10.00 |
| Mileage | $_____ (____ miles @ $ ._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

TOTAL P.001

# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

CIRCUIT COURT OF
ST. LOUIS COUNTY

| | |
|---|---|
| Judge or Division:<br>COLLEEN DOLAN | Case Number: 12SL-CC04019 |
| Plaintiff/Petitioner:<br>LESLIE YOFFIE | Plaintiff's/Petitioner's Attorney/Address<br>RICHARD S CORNFELD<br>1010 MARKET STREET<br>STE 1605<br>ST LOUIS, MO 63101 |
| vs. | |
| Defendant/Respondent:<br>BAYER HEALTHCARE LLC | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>7900 CARONDELET AVE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

2012 NOV 28  PM 2: 32

JOAN M. GILMER
CIRCUIT CLERK

## Summons in Civil Case

RECEIVED

The State of Missouri to:  BAYER HEALTHCARE LLC
                          Alias:

CSC LAWYERSS INCORPORATING
SERVICE COMPANY
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

NOV 0 7 2012

COLE COUNTY
SHERIFF'S OFFICE

COURT SEAL OF

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

ST. LOUIS COUNTY

29-OCT-2012
Date

Further Information:
JMC

Clerk

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).

☒ other SERVED BAYER HEALTHCARE LLC c/o CSC... S. LEWIS DESIGNEE
Served at 221 BOLIVAR ST. J.C., MO. 65101 (address)
in COLE (County/City of St. Louis), MO, on 11·14·12 (date) at 0800 (time).

G. WHITE
Printed Name of Sheriff or Server

John P. Dinkins
Signature of Sheriff or Server

Must be sworn before a notary public if not served by an authorized officer:

Subscribed and sworn to before me on _____ (date).

(Seal)

My commission expires: _____
                        Date

_____
Notary Public

| Sheriff's Fees, if applicable | | |
|---|---|---|
| Summons | $ | |
| Non Est | $ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $ 10.00 | |
| Mileage | $ | (_____ miles @ $ _____ per mile) |
| Total | $ | |

A copy of the summons and a copy of the petition must be served on each Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

**LESLIE YOFFIE,**

**Plaintiff,**

**v.**

**BAYER HEALTHCARE, LLC,**

**Defendant.**

Case No.

Div.

**JURY TRIAL DEMANDED**

**20**

## CERTIFICATE OF SERVICE

The undersigned states that a true and correct copy of Plaintiff's First Request for Admissions Directed to Defendant Bayer Healthcare, LLC; Plaintiff's First Set of Interrogatories Directed to Defendant Bayer Healthcare, LLC; and Plaintiff's First Request for Production Directed to Defendant Bayer Healthcare, LLC was included with the Petition and Summons, to be served with them, on the following:

Bayer Healthcare LLC
Serve: CSC Lawyers Incorporating Service Company
      221 Bolivar Street
      Jefferson City, MO 65101
      (800) 927-9800

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

| | |
|---|---|
| **LESLIE YOFFIE,** | |
| Plaintiff, | |
| | Case No. |
| v. | |
| | Div. |
| **BAYER HEALTHCARE, LLC,** | |
| Defendants. | |

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS
## DIRECTED TO DEFENDANT BAYER HEALTHCARE, LLC

COMES NOW Plaintiff, by and through his counsel of record, and pursuant to the applicable Missouri Supreme Court Rules and rules of this court, plaintiff propounds the following request for admission to be answered by Bayer Healthcare, LLC in writing, under oath, within the time provided by the Missouri Rules of Civil Procedure.

### DEFINITIONS

1.    Whenever the terms "Defendant Bayer," "Bayer," "you," and "your" are used, those terms shall refer to the party to whom this request is addressed and all predecessors of said party and their past and present subsidiaries and parents, agents, servants, and employees, and unless privileged, counsel for said parties.

2.    Whenever the term "subject medication" or "subject medications" is used, that term shall refer to Bayer Aspirin, as referenced in Plaintiff's Petition.

### REQUESTS FOR ADMISSION

1.    Admit that Defendant Bayer is a corporation in good standing.

**ANSWER:**

2.      Admit that Bayer has been sued in its correct corporate name.

**ANSWER:**

3.      Admit that the subject medication referred to in the Petition was manufactured by you.

**ANSWER:**

4.      Admit that the subject medication was marketed by you in Missouri.

**ANSWER:**

5.      Admit that the subject medication was sold by you in Missouri.

**ANSWER:**

6.      Admit that the subject medication was purchased by consumers in Missouri.

**ANSWER:**

7.      Admit that the subject medication was used by consumers in Missouri.

**ANSWER:**

8.      Admit that the subject medication sold in Missouri bears an "expiration dates."

**ANSWER:**

9.     Admit that some consumers in Missouri discarded the subject medications after their "expiration dates."

**ANSWER:**


10.     Admit that the decision regarding the specific "expiration date" to test for placing on the subject medication was made by you.

**ANSWER:**


11.     Admit that Defendant advises consumers to discard the subject medications if their "expiration dates" have passed.

**ANSWER:**


12.     Admit that Defendant advises consumers to replace the subject medications if their "expiration dates" have passed.

**ANSWER:**


13.     Admit that Defendant maintains web pages for the subject medication that contain the following "Frequently Asked Question" and answer:

Can I use Bayer Aspirin beyond the labeled expiration date?

It is not recommended to use any OTC product beyond the labeled expiration date. Like all drugs, aspirin can deteriorate over time and not be as effective once it is past expiration.


**ANSWER:**


3

14.    Admit that Bayer considers its expiration dating to be "pretty conservative."

**ANSWER:**


15.    Admit that when Bayer has tested four-year-old subject medication, it remained 100% effective.

**ANSWER:**


16.    Admit Bayer has never tested the subject medication for stability, safety or effectiveness beyond four years.

**ANSWER:**


17.    Admit that the Bayer is aware of a study or studies on the stability, safety and/or effectiveness of Bayer aspirin by Jens Carstensen.

18. **ANSWER:**


19.    Admit that the Bayer is aware that Jens Carstensen of the University of Wisconsin did a study of aspirin and found that after five years, Bayer aspirin was still excellent.

**ANSWER:**


20.    Admit that aspirin, if made correctly, is very stable.

**ANSWER:**

21.    Admit that, if stored properly, medication can remain effective for months or even years after its "expiration date."

**ANSWER:**

22.    Admit that you are a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA").

**ANSWER:**

23.    Admit that you are a member of the Consumer Healthcare Products Association ("CHPA").

**ANSWER:**

24.    Admit that PhRMA participates in a campaign called "SMAR$_x$T DISPOSAL."

**ANSWER:**

25.    Admit that  CHPA is a supporter of "SMAR$_x$T DISPOSAL."

**ANSWER:**

26.    Admit that "SMAR$_x$T DISPOSAL" maintains a web site that states that "if stored properly, medication can remain effective (biologically active) for months or even years after the expiration date."

**ANSWER:**

27.    Admit that "SMAR$_x$T DISPOSAL" targets consumers of medication to provide guidance on disposal of over-the-counter medication that has passed its "expiration dates."

**ANSWER:**


28.    Admit that "SMAR$_x$T DISPOSAL" advises consumers to discard over-the-counter medication that has passed its "expiration date."

**ANSWER:**


29.    Admit that PhRMA and CHPA sponsor a campaign entitled "The American Medicine Chest Challenge" to curb drug abuse.

**ANSWER:**


30.    Admit that "The American Medicine Chest Challenge" encourages consumers to take an inventory of their over-the-counter medicine.

**ANSWER:**


31.    Admit that "The American Medicine Chest Challenge" encourages consumers to discard over-the-counter medicine that has passed its "expiration date."

**ANSWER:**


32.    Admit that CHPA publicly states that consumers should, from time to time, review the contents of their over-the-counter medicine inventory and discard products whose dates are past the "expiration date" fixed on the package.

**ANSWER:**


33.    Admit that according to PhRMA, the reason manufacturers do not test drugs for

longer periods is:  Why would a company spend time and money testing a drug's shelf life when

its patent expires after a number of years?

**ANSWER:**


34.    Admit that it is not unsafe to take the subject medication after its "expiration

date."

**ANSWER:**


35.    Admit that you have never received a report of a consumer injury caused by

taking the subject medication after the "expiration date."

**ANSWER:**


Respectfully submitted,

LAW OFFICE OF RICHARD S. CORNFELD

By: _____

Richard S. Cornfeld, #31046
1010 Market Street, Suite 1605
St. Louis, MO  63101
(314) 241-5799
(314) 241-5788 (fax)

7

rcornfeld@cornfeldlegal.com

*Attorney for Plaintiff*

8

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

| | |
|---|---|
| **LESLIE YOFFIE,** | |
| **Plaintiff,** | |
| | **Case No.** |
| **v.** | |
| | **Div.** |
| **BAYER HEALTHCARE, LLC,** | |
| **Defendants.** | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION
## DIRECTED TO DEFENDANT BAYER HEALTHCARE, LLC

COMES NOW Plaintiff, by and through his counsel of record, and pursuant to the

applicable Missouri Supreme Court Rules and rules of this court, propounds upon Defendant

Bayer Healthcare, LLC this First Request for Production, to be produced within the time

provided by the Missouri Rules of Civil Procedure.

### Definitions

1.    Whenever the terms "document" or "documents" are used, they shall mean,

unless otherwise indicated, all letters, correspondence, telegrams, paper communications,

tabulations, charts, memoranda, records, or transcripts by any mechanical device, by longhand or

shorthand recording, or by any other means; interoffice communications, microfilm, bulletins,

circulars, ledgers, journals, invoices, balance sheets, profit and loss statements, pamphlets,

studies, notices, summaries, reports, analysis, teletype messages, worksheets, and other graphic

materials, writings and instruments however produced or reproduced.  Said definitions shall

include inter alia, records, transcripts and/or summaries or oral communications, telephonic or

otherwise.

2.      Whenever the phrase "all documents" is used, it shall mean each and every document within a stated category, known to the parties and/or documents reasonably subject to identification, and/or documents which can be located by the use of reasonable diligence, whether located on the premises owned by the parties to whom this request is addressed or elsewhere.  Documents located on premises other than the premises of the said parties to whom this request is addressed are specifically included.

3.      Whenever you are requested to produce any information which is stored in a computer or electronic file or data compilation, whether or not the request for production specifically requests "electronic media," state the title, format, disk number, electronic location, physical location, custodian of and person(s) with access to the file or data compilation.

4.      Whenever you are requested to produce electronic media, that phrase shall refer to all information created, transferred to or from, and/or stored in a computer or electronic file, or data compilation, or voice mail or any other recorded messaging services.  State the title, format, disk number, electronic location, physical location, and custodian of a person with access to the file or date compilation.  "Electronic media" shall also include the physical backup tapes and all other archival media, all magnetically and optically recorded documents, all archival copies, all electronically created or recorded documents and all documents that have been logically deleted but not physically erased.

5.      If you claim privilege, qualified work-product immunity, or decline to produce documents as requested on the basis of some other objections, list all such documents in chronological order, setting forth for each:

      a.      The author;

      b.      The title;

      c.      The addressee;

d.　　The type of document (i.e. letter, report, memorandum, etc.);

e.　　The subject matter (without revealing the information as to which privilege or immunity is claimed or objection is made);

f.　　The basis for the claim of privilege, immunity, or objection; and

g.　　The identity of all persons to whom copies of such documents were sent.

6.　　Whenever the term "Plaintiff" is used, that term shall refer to the Plaintiff named in the Petition of this case.

7.　　Whenever the terms "Defendant," "Bayer," "you," and "your" are used, those terms shall refer to the party to whom this request is addressed and all predecessors of said party and their past and present subsidiaries and parents, affiliated corporations, agents, servants, and employees, and unless privileged, counsel for said parties.

8.　　Whenever the term "subject medication" is used, that term shall refer to Advil as described in Plaintiff's Petition.

## **Requests**

1.　　Any and all insurance and indemnity agreements related to any potential liability of Defendant in this action.

2.　　All packaging utilized by Defendant for the subject medication during the past five years.

3.　　Any and all documents sufficient to identify each version or iteration of the packaging of the subject medication during the past five years.

4.　　Documents referring or relating to or containing representations made by you to consumers, including but not limited to advertisements, web pages, and product literature regarding the "expiration dates" of the subject medication.

3

5.    Documents referring or relating, directly or indirectly, to consideration of, proposals for, or discussions regarding representations to consumers regarding the "expiration dates" of the subject medication.

6.    Documents containing representations made by an industry or trade association to which you belong, to consumers, including but not limited to advertisements, web pages, and product literature, referring or relating to the "expiration dates" of the subject medication or other over-the-counter medications.

7.    Documents referring or relating, directly or indirectly, to representations to consumers considered, proposed, discussed, contemplated or made by an industry or trade association to which you belong, relating to the "expiration dates" of the subject medication.

8.    All financial statements of Defendant from 2007 to present indicating the revenue generated from the subject medication in Missouri.

9.    All documents indicating the quantity of subject medication sold by Defendant from 2007 to present in Missouri, including those sold to third parties for resale in the State of Missouri.

10.    All memoranda, reports, electronic mails, correspondence, studies, and documents related to Defendant's decision regarding the "expiration dates" to place on the subject medication or to test for the possibility of placing on the subject medication.

11.    All scientific research, testing, studies, reports, and documents that support the "expiration dates" of the subject medication, including but not limited to all written testing programs to assess the stability characteristics of the subject medication.

4

12.    All scientific research, testing, studies, reports, and documents pertaining to whether any or all of the subject medication is or would be stable, safe and/or effective after the "expiration date."

13.    All documents related to scientific research, testing, studies, reports and documents pertaining to the stability of aspirin by Jens Carstensen or other scientist(s) not employed by Bayer.

14.    All scientific research, studies, surveys, reports and documents pertaining to consumers' disposal, after its "expiration date," of the subject medication, other over-the-counter medication or over-the-counter medication in general.

15.    Any and all documents discussing or referring or related to the "expiration dates" of the subject medication.

16.    Any and all correspondence or documents between Defendant and any federal, state, or local government entity referring or related to the "expiration dates" of the subject medication.

17.    Copy of the petition or complaint in all lawsuits filed against Defendant related to "expiration dates" of the subject medication.

18.    . Any and all documents referring or relating to or constituting consumer complaints, inquiries or correspondence received by or in the possession of Defendant, whether formal or informal, that in any way relate to "expiration dates" of the subject medication.

19.    Any and all documents discussing, or referring or relating to the issue of how to respond to consumer complaints or inquiries regarding "expiration dates" of the subject medication.

20.    Any and all documents referring or relating to an article that appeared in the Wall Street Journal, in or about March 2000, entitled "Many Medicines Are Potent Years Past Their Expiration Dates" or any other article in the Wall Street Journal regarding "expiration dates."

21.    Any and all documents referring or relating, directly or indirectly, to the Shelf Life Extension Program discussed in the Petition.

22.    Any and all correspondence, memorandum, report, and documents stating the volume of subject medication sold in the State of Missouri in the last five years.

23.    All documents referring or relating to reports of injury in consumer(s) who consumed a subject medication or other over-the-counter medication that was past its "expiration date."

24.    Any and all recorded statements or other documents concerning Plaintiff.

25.    Any and all recorded statements regarding the subject matter of this litigation.

26.    All documents identified in Defendant's Response to Plaintiff's First Set of Interrogatories directed to Defendant.

27.    All documents referring or relating to the Q and A quoted in the Petition from the page of FAQs, found at http://www.wonderdrug.com/faq.htm#ql.

Respectfully submitted,

LAW OFFICE OF RICHARD S. CORNFELD

By

Richard S. Cornfeld, #31046
1010 Market Street, Suite 1605
St. Louis, MO  63101
(314) 241-5799

6

(314) 241-5788 (fax)
rcornfeld@cornfeldlegal.com

*Attorney for Plaintiff*

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

LESLIE YOFFIE,

                **Plaintiff,**

v.

BAYER HEALTHCARE, LLC,

             **Defendants.**

Case No.

Div.

**JURY TRIAL DEMANDED**

**20**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANT BAYER HEALTHCARE, LLC

COMES NOW Plaintiff, by and through his counsel of record, and pursuant to the applicable Missouri Supreme Court Rules and rules of this court, propounds the following interrogatories to be answered by Bayer Healthcare, LLC in writing, under oath, within the time provided by the Missouri Rules of Civil Procedure.

## DEFINITIONS

1.      Whenever in these Interrogatories the terms "document" or "documents" are used, they shall mean, unless otherwise indicated, all letters, correspondence, emails, telegrams, paper communications, tabulations, charts, memoranda, records, or transcripts by any mechanical device, by longhand or shorthand recording, or by any other means; interoffice communications, microfilm, bulletins, circulars, ledgers, journals, invoices, balance sheets, profit and loss statements, pamphlets, studies, notices, summaries, reports, analysis, teletype messages, worksheets, and other graphic materials, writings and instruments however produced or reproduced, whether in hard copy or electronically.  Said definitions shall include inter alia, records, transcripts and/or summaries or oral communications, telephonic or otherwise, as well as all pages or communications displayed over the internet.

2.    Whenever in these Interrogatories the phrase "all documents" is used, it shall mean each and every document within a stated category, known to the parties and/or documents reasonably subject to identification, and/or documents which can be located by the use of reasonable diligence, whether located on the premises owned by the parties to whom this request is addressed or elsewhere. Documents located on premises other than the premises of the said parties to whom this request is addressed are specifically included.

3.    Whenever in these Interrogatories you are requested to "identify" a person, corporation, or other entity, state the name, last known business address, last known residence address (and last date of such addresses), and telephone number of the person, corporation, or other entity.

4.    Whenever in these Interrogatories you are requested to "identify" a document, state the title, date of creation, author, location, and present custodian of the document.

5.    Whenever you are asked to identify a web page, state its url address, the date when it was first publically available over the internet, the date when it was last publically available over the internet, its author and its present custodian if not currently available over the internet.

6.    If you claim privilege, qualified work-product immunity, or decline to produce documents as requested on the basis of some other objections, list all such documents in chronological order, setting forth for each:

      a.    The author;

      b.    The title;

      c.    The addressee;

      d.    The type of document (i.e. letter, report, memorandum, etc.);

2

e.      The subject matter (without revealing the information as to which privilege or immunity is claimed or objection is made);

f.      The basis for the claim of privilege, immunity, or objection; and

g.      The identity of all persons to whom copies of such documents were sent.

7.      Whenever the term "Plaintiff" is used, that term shall refer to the Plaintiff named in the Petition of this case.

8.      Whenever the terms "Defendant," Bayer," "you," and "your" are used, those terms shall refer to the party to whom this request is addressed and all predecessors of said party and their past and present subsidiaries and parents, affiliated corporations, agents, servants, and employees, and unless privileged, counsel for said parties.

9.      Whenever the term "subject medication" is used, that term shall refer to Advil as described in Plaintiff's Petition.

## INTERROGATORIES

1.      State the name and present business address of each and every individual answering these interrogatories or who supplied information used to answer these interrogatories, including any person(s) retained on Defendant's behalf, and identify his, her, or their legal capacity within Defendant's corporate administration.

**ANSWER:**

2.      State whether Defendant has done business under any other name during the last fifteen (15) years. If so, please state the names under which Defendant has done business, the

3

dates Defendant operated under each name, and the address of the principal place of business for each.

     **ANSWER:**

     3.     Identify by name, address, occupation, place of employment and qualifications to give an opinion, or if such information is available on the expert's curriculum vitae, attach same, regarding each person you expect to call as an expert witness at the trial of this matter and state the general nature of the subject matter on which the expert is expected to testify, and the expert's hourly deposition fee.

     **ANSWER:**

     4.     Identify each non-retained expert witness, including a party, you expect to call at trial who may provide expert witness opinion testimony by providing the expert's name, address and field of expertise.  State also any opinions the expert will testify to at trial.

     **ANSWER:**

5.      Identify all persons known to the Defendant involved in marketing the subject medication.

**ANSWER:**

6.      Identify all persons known to Defendant with knowledge of the development of the "expiration dates" shown on the packages of the subject medication.

**ANSWER:**

7.      Identify all persons known to Defendant who designed, took part in or oversaw any and all tests or studies pertaining to the "expiration dates" of the subject medication, including their role in each such test or study.

**ANSWER:**

8.      Has Defendant ever performed research, testing or a study to determine whether any of the subject medication is chemically stable, safe or effective after the "expiration date" printed on the package?  If so, identify all persons with knowledge of such tests and all

5

documents pertaining to such tests and all documents that refer or relate to such research, testing or study.

**ANSWER:**

9.      Whether or not Defendant has performed research, testing or a study to determine whether any of the subject medication is chemically stable, safe or effective after the "expiration date" on the package, has Defendant ever considered performing such research, testing or study? If so, identify all persons with knowledge of such tests and all documents pertaining to such consideration or such tests and all documents that refer or relate to such research, testing or study.

**ANSWER:**

10.      Identify Chris Allen.

**ANSWER:**

11.      Identify all persons known to Defendant who provided information relied upon by the "**SMARᵣT DISPOSAL**" campaign in making the following statement in words or substance:

6

"[I]f stored properly, medications can remain effective (biologically active) for months or even years after the expiration date."

**ANSWER:**

12.    Identify all documents regarding recommendations made or to be made to the public regarding whether to discard over-the-counter medications that have passed their "expiration dates."

**ANSWER:**

13.    Identify all web pages that you have displayed over the internet that refer or relate to the "expiration date" of over-the-counter medications.

**ANSWER:**

14.    Identify all persons who provided information relied on by you in making the statements entitled FAQs quoted in the Petition, the information so provided and all documents containing such information.

**ANSWER:**

Respectfully submitted,

LAW OFFICE OF RICHARD S. CORNFELD

By:

Richard S. Cornfeld, #31046
1010 Market Street, Suite 1605
St. Louis, MO 63101
(314) 241-5799
(314) 241-5788 (fax)
rcornfeld@cornfeldlegal.com

*Attorney for Plaintiff*

8

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

## Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

## Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

## Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the partes. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

CCADM73

(2) **Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

(3) **Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

(4) **Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

(5) **Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.